*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* J. MOORE, Minor.

UNPUBLISHED
January 13, 2025
9:25 AM

No. 371990
Kalamazoo Circuit Court
Family Division
LC No. 2023-000298-NA

Before: PATEL, P.J., and MURRAY and YATES, JJ.

PER CURIAM.

Respondent-father appeals the order terminating his parental rights to his minor child, JM, under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury), MCL 712A.19b(3)(b)(*ii*) (parent failed to protect), MCL 712A.19b(3)(j) (reasonable likelihood that child will be harmed if returned to parent), and MCL 712A.19b(3)(k) (parent caused life-threatening injury). He contends the trial court erred in conducting the adjudication and the dispositional hearing in a single proceeding. He also faults the Department of Health and Human Services (DHHS) for failing to provide reasonable efforts toward reunification. He further claims that the trial court incorrectly found that statutory grounds for termination of his parental rights existed. Finally, he insists that the termination of his parental rights was not in the best interests of JM. We affirm.

## I. FACTUAL BACKGROUND

In July 2023, JM was administered Narcan in the emergency room and then hospitalized after being exposed to illegal substances in the home. The DHHS took custody of JM and placed JM with her maternal grandmother. Respondent-father was granted supervised visits. In October 2023, respondent-father took JM to his home for an entirely unsupervised visit. Respondent-father lived with his uncle, whom he knew regularly used "crack, heroin, pills, and alcohol." Respondent-father subsequently told Children's Protective Services (CPS) that he had cleaned the house except for a "window sill area" that contained "pop cans" and lighters. JM was playing in that area under respondent-father's supervision when "she started acting funny," so respondent-father took JM to the hospital, but he only stayed long enough to tell the emergency department that "something [is] wrong with my daughter. I don't know if it's an allergic reaction, or what it is, but she's not acting normal." Respondent-father then "rushed back home" and did not return to the hospital that night,

later telling CPS he was "very scared." JM was again administered Narcan at the hospital, and her condition stabilized.

Respondent-father was arrested soon after that incident for violating the terms of his parole, and he remained incarcerated for the duration of these proceedings. In October 2023, the DHHS filed a petition requesting removal of JM from the care of respondent-father and JM's mother.[1] At the termination hearing, respondent-father testified that, while he was incarcerated, he tried "to do everything that—that they had available," including substance-abuse classes and counselling. His release date from incarceration was scheduled for July 2024. The trial court concluded the hearing by terminating respondent-father's parental rights to JM, stating: "[T]he question is why terminate. Simple. The absolute disregard for the safety of this child by the father, who has not learned from a very serious incident of July of 2023, he cannot be around this child." This appeal followed.

## II. LEGAL ANALYSIS

Respondent-father contends on appeal that the trial court erred by holding the adjudication and the dispositional hearing at the same time. Also, respondent-father argues that the DHHS did not provide reasonable efforts toward reunification. Next, respondent-father asserts that the trial court erred when it found that statutory grounds for termination of parental rights were established under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k). Finally, respondent-father claims termination of his parental rights was not in the best interests of JM. We shall address these arguments in turn.

## A. CONSOLIDATION OF ADJUDICATION AND THE DISPOSITIONAL HEARING

Respondent-father faults the trial court for conducting a combined hearing to address both adjudication and disposition, but he failed to present that argument in the trial court. To preserve an issue for appeal, a respondent must present that issue to the trial court. Unpreserved issues are analyzed only for plain error. *In re Pederson*, 331 Mich App 445, 463; 951 NW2d 704 (2020). In order to avoid forfeiture under the plain error rule, four requirements must be met: (1) error must have occurred; (2) the error was plain, i.e., clear or obvious; (3) the plain error affected substantial rights; and (4) if the first three requirements are satisfied, this Court must exercise its discretion to decide whether to reverse. *Id*.

Child protective proceedings are "divided into two distinct phases: the adjudicative phase and the dispositional phase." *In re AMAC*, 269 Mich App 533, 536; 711 NW2d 426 (2006). "The adjudicative phase occurs first and involves a determination whether the trial court may exercise jurisdiction over the child . . . ." *Id*. The "state must file in the family division of the circuit court a petition containing facts that constitute an offense against the child under the juvenile code." *In re Sanders*, 495 Mich 394, 405; 852 NW2d 524 (2014). The petition must include a "citation to the section of the Juvenile Code relied on for jurisdiction." MCR 3.961(4). Then, if the trial court authorizes the petition, the respondent-parent can either admit the allegations, plead no contest, or demand a trial contesting the allegations. *In re Sanders*, 495 Mich at 405. If at least one statutory ground for jurisdiction set forth in MCL 712A.2(b) is established, either at trial or by plea, the trial

---

[1] JM's mother was initially a respondent in this case, but because she was making progress toward reunification, she is not a party to this appeal.

court can assume jurisdiction over the child. *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008).

"Once a court assumes jurisdiction over a child, the parties enter the dispositional phase." *In re Sanders*, 495 Mich at 406. Unlike the adjudicative phase, the rules of evidence do not apply at the dispositional phase and "the respondent is not entitled to a jury determination of facts." *Id*. The purpose of the dispositional phase is to determine what measures the trial court will take with respect to a child properly within its jurisdiction and, when applicable, against any adult. *Id*. Here, on the first day of the consolidated hearing concerning respondent-father, the trial court stated that "[t]his is a request of termination. [Respondent-father] has not been adjudicated on." During the prosecutor's opening statement, she explained that "we're here for a termination today, and we're going to first get to the adjudication" under MCL 712A.2b(1) by showing that respondent-father "neglected and refused to—refused to provide the care necessary" to protect the child "from illegal substances creating a substantial risk of harm to her." The prosecutor also stated that adjudication was going to be completed under MCL 712A.2b(2) by showing that respondent-father "has a home environment that by reason of neglect, criminality, or depravity is an unfit place" for the child to live. The prosecutor explained each of the statutory grounds to be proven as well.

On the final day of the consolidated hearing, the trial court began rendering its findings by stating that the prosecution met its burden of proving "by a preponderance of the evidence that the court should take jurisdiction over the minor child" under MCL 712A.2b. The trial court explained that "the court will take jurisdiction over the minor child based on the actions of the father." Then the trial court made its findings on each of the statutory grounds for termination, ultimately finding that "the prosecution has met their burden throughout." Finally, the trial court rendered its findings as to the child's best interests and terminated respondent-father's parental rights.

Respondent-father now argues that the trial court was required to hold the adjudication and dispositional hearings separately. Respondent-father contends that the trial court plainly erred in a manner that affected his substantial rights by holding the two hearings at the same time, primarily because of the different burdens of proof and rules of evidence at the adjudication hearing and the dispositional hearing. See *In re Sanders*, 495 Mich at 406. This argument is unpersuasive.

The trial court plainly erred when it consolidated the adjudication trial and the dispositional hearing. See *In re Mota*, 334 Mich App 300, 317; 964 NW2d 881 (2020). But respondent-father's substantial rights were not affected by the plain error. See *id*. at 317-318. The trial court relied on evidence that was supported by the record to justify both the exercise of jurisdiction over JM and the termination of respondent-father's parental rights. See *id*. at 318. Consequently, although the trial court committed "procedural errors in conducting the adjudicative and dispositional phases of the case," *id*., the errors did not affect respondent-father's substantial rights or the outcome of the lower-court proceedings. If the trial court had conducted the adjudication first and then turned to the dispositional hearing, the abundance of evidence presented at the consolidated hearing would have supported the exercise of jurisdiction over JM and then the termination of respondent-father's parental rights to JM. Therefore, respondent-father is not entitled to reversal.

## B. REASONABLE EFFORTS

Respondent-father argues that, during the time between JM's first and second exposure to controlled substances, reasonable efforts were not made toward reunification or toward addressing respondent-father's substance abuse, so reversal is warranted. "A natural parent has a fundamental liberty interest in the care, custody, and management of his child that is protected by the Fourteenth Amendment of the United States Constitution." *In re Rood*, 483 Mich 73, 90; 763 NW2d 587 (2009) (quotation marks omitted). Due process requires "fundamental fairness." *Id*. at 92. "[T]o comply with the guarantees of substantive due process, the state must prove parental unfitness by at least clear and convincing evidence before terminating a respondent's parental rights." *In re B and J*, 279 Mich App 12, 23; 756 NW2d 234 (2008) (quotation marks and citation omitted).

"When a child is removed from a parent's custody, the agency charged with the care of the child is required to report to the trial court the efforts made to rectify the conditions that led to the removal of the child." *In re Plump*, 294 Mich App 270, 272; 818 NW2d 119 (2011). Reasonable efforts involve creation of a case service plan, i.e., a "plan developed by an agency . . . that includes services to be provided by and responsibilities and obligations of the agency" as well as "activities, responsibilities, and obligations of the parent." MCL 712A.13a(1)(d). More specifically, the case service plan must include a "[s]chedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement." MCL 712A.18f(3)(d).

According to MCL 712A.19a:

> (2) The court shall conduct a permanency planning hearing within 30 days after there is a judicial determination that reasonable efforts to reunite the child and family are not required. Reasonable efforts to reunify the child and family must be made in all cases except if any of the following apply:

> (a) There is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in section 18(1) and (2) of the child protection law, 1975 PA 238, MCL 722.638.

"Aggravated circumstances," which include "[l]ife threatening injury[,]" MCL 722.638(1)(a)(*v*), "are present both for a parent who is a 'suspected perpetrator' of such abuse and a parent who is 'suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate' " the risk. *In re Smith-Taylor*, 509 Mich 935, 935; 971 NW2d 657 (2022), quoting MCL 722.638(2).

Here, respondent-father was entitled to "[r]easonable efforts" toward reunification after the July 2023 incident pursuant to MCL 712A.19a(2) because the trial court did not make a "judicial determination that the parent has subjected the child to aggravated circumstances," *In re Smith-Taylor*, 509 Mich at 936, at that time, and the DHHS did not petition for termination of respondent-father's parental rights until after the second incident in October 2023.

A foster-care worker handling JM's case in July 2023 said that she set up respondent-father for random drug screenings after the incident and affirmed that she recalled that respondent-father tested positive for cocaine, fentanyl, THC, and possibly xylazine. She also testified that she looked

into parenting classes for respondent-father and "encouraged him to look into counseling as well," but she affirmed that she did not set up those services for him and he was not ordered to participate in any of those services. She explained that, at that time, "there was the back and forth with what county was taking jurisdiction" and because there was no "pretrial set up to get services in place," she coordinated with respondent-father's parole officer "to set up substance abuse counseling since [the parole officer] could get that court ordered." She testified that she also supervised parenting time for both respondent-father and JM's mother.

The week before the October 2023 incident, the foster-care worker was asked to conduct a wellness check on respondent-father after she received a call from the drug-testing facility stating that respondent-father had "a lethal amount of fentanyl in him." The foster-care worker testified that respondent-father had also failed to confirm his supervised parenting visit for that day. As the foster-care worker testified, she placed a call to respondent-father "because he did not confirm his parenting time. So, I played it off as that's why I was checking on him, because I don't want to discuss screens over the phone with the people that I work with." She explained that respondent-father said he did not confirm his parenting time because the foster-care worker "did not text him the night before to remember." The foster-care worker stated that respondent-father later cited the foster-care worker's failure to text him as the reason why he took the child in October 2023.

The DHHS, through the foster-care worker handling respondent-father's case in July 2023, clearly made reasonable efforts toward reunification. Respondent-father argues that if more efforts had been made to address his substance abuse, the October 2023 incident would not have occurred. But the foster-care worker testified that respondent-father "always denied" his drug use. Also, the foster-care worker denied that respondent-father ever indicated to her that he had any substance-abuse issues or that he wanted help with his substance abuse. Respondent-father was given many opportunities to participate in those services, but he lost access to them because of his own actions, which ultimately led to his incarceration. See *In re Medina*, 317 Mich App 219, 227; 894 NW2d 653 (2016). Accordingly, the trial court did not commit clear error by finding that the DHHS had made reasonable efforts to reunify respondent-father with JM before the DHHS sought termination of his parental rights.

## C. STATUTORY GROUNDS

Respondent-father challenges the trial court's finding that termination was supported under MCL 712A.19b(3)(b)(*i*). "[T]o terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). We review for clear error the trial court's decision that a statutory ground for termination has been proven. *In re Olive/Metts*, 297 Mich App 35, 40; 823 NW2d 144 (2012). A finding is clearly erroneous only if the reviewing court has "a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). "Whether proceedings complied with a party's right to due process presents a question of constitutional law that we review de novo." *In re Rood*, 483 Mich at 90.

The trial court found that JM suffered a physical injury due to respondent-father's actions and that there was a reasonable likelihood that JM would suffer from injury in the future if placed

back in respondent-father's care. In July 2023, JM was exposed to drugs while she was in the care of respondent-father and mother, and the doctor who treated JM that day testified that, when JM arrived at the hospital, she was experiencing both "bradypnea," "a slowing of the respiratory rate," and "bradycardia," "the slowing of the heart rate." The doctor affirmed that the conditions, if left untreated, could result in death, and that JM was administered several doses of Narcan before her condition was stabilized.

In October 2023, although respondent-father knew he was under court-ordered restrictions to have only supervised visits with JM after the July 2023 incident, respondent-father took JM to his uncle's house, even though he knew his uncle had been using drugs in the home. Respondent-father permitted JM to play in an area that he had not cleaned. And when JM became ill, he then dropped her at the hospital and did not stay with her or visit her afterward. The doctor who treated JM testified that respondent-father did not identify himself when he dropped off JM and the child was "by herself with the nurse when I walked into the room." The doctor also stated that JM was administered Narcan three times and that JM's urine drug screen tested positive for opiates. The doctor testified that it was "certainly possible" that, without medical intervention, JM would not have survived.

Respondent-father contends that, before bringing JM to his house in October 2023, he was unaware that there were substances present that could harm her, so it cannot be said that his conduct was the factual cause of her injury. Further, respondent-father argues that because the presence of the substances was not foreseeable, his conduct was also not the proximate cause of JM's injury. Respondent-father's claim that he was "unaware" of the possibility of harmful substances in the home is not persuasive. Respondent-father told CPS that "he cleaned up the house, but he did not clean the window sill area," and he permitted the child to play in that area under his supervision, even though there were cans and lighters there. Respondent-father's argument that the presence of substances was not foreseeable is also not persuasive. Respondent-father told CPS that he knew his uncle had been using drugs in the home and he also knew he had not cleaned the entire house.

"[F]or [a] physical injury to fall within MCL 712A.19b(3), it must be caused by a 'parent's act' or a 'nonparent adult's act' and not merely contributed to by an unintentional omission." *In re LaFrance*, 306 Mich App 713, 725; 858 NW2d 143 (2014). Here, respondent-father's act of taking JM to his home was the cause of her injury. See *id*. Respondent-father knew that he had cleaned everywhere in the home except the area by the window, which he told CPS was an area where he knew his uncle had been using drugs. Therefore, JM's injury did not result from an unintentional omission. See *id*.

Sufficient evidence was presented in the trial court to establish that there was a reasonable likelihood that JM would suffer a life-threatening injury in the foreseeable future if she were in the care of respondent-father, and the trial court did not err by finding that termination of respondent-father's rights was proper under MCL 712A.19b(3)(b)(*i*).[2] Because the record contains sufficient

---

[2] Given this conclusion, we need not address respondent-father's arguments concerning the other statutory grounds for termination. See *In re HRC*, 286 Mich App 444, 461; 781 NW2d 105 (2009). Regardless, having reviewed the record, we conclude that, although the trial court clearly erred by

evidence to support one statutory ground for termination, "we need not consider whether the other grounds cited by the trial court also supported the termination decision." *In re Foster*, 285 Mich App 630, 633; 776 NW2d 415 (2009).

## D.  BEST INTERESTS

Finally, respondent contends that termination was not in the child's best interests. "Once a statutory ground for termination has been proven, the trial court must find that termination is in the child's best interests before it can terminate parental rights." *In re Olive/Metts*, 297 Mich App at 40. When considering best interests, the focus is on the child's interests rather than the parent's interests. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). "The trial court should weigh all the evidence available to determine the child's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). When deciding whether termination is in the child's best interests, the trial court may consider the child's bond with the parent; the parent's parenting ability; the child's need for permanency, stability, and finality; and the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App at 41-42. The trial court may also consider the likelihood that "the child could be returned to [the] parent's home within the foreseeable future, if at all." *In re Frey*, 297 Mich App 242, 248-249; 824 NW2d 569 (2012). The best interests of the child "are determined on the basis of the preponderance of the evidence." *In re LaFrance*, 306 Mich App at 733.

With regard to JM's best interests, the trial court found that she was doing well in her foster placement and her mother was working toward possible reunification with her. Respondent-father claims the trial court erred by finding that termination was in JM's best interests because no expert testimony was offered concerning his ability to change in order to work toward reunification. But respondent-father provides no authority to support his claim that he was entitled to such testimony. "Failure to brief a question on appeal is tantamount to abandoning it." *Mitcham v Detroit*, 355 Mich 182, 203; 94 NW2d 388 (1959). Even if such testimony had been presented, the trial court would still have been required to weigh all of the evidence available to determine the best interests of the child. See *In re White*, 303 Mich App at 713. The trial court found that most of the evidence demonstrated that respondent-father failed to protect JM and she was at a substantial risk of harm if returned to respondent-father's care and custody.

Respondent-father also asserts that the trial court incorrectly presumed that it would be two or more years before respondent-father could be reunited with his child. This is a misstatement of the trial court's findings. The trial court stated that, if JM was returned to respondent-father's care, "[i]t could be 6-months, it could be a year, it could be a [sic] 2-years from now" until JM was again exposed to harmful substances. Consequently, respondent-father's argument is misplaced, and the trial court did not err by finding that termination was in the best interests of JM.

---

finding clear and convincing evidence to support termination under MCL 712A.19b(3)(b)(*ii*) when the focus at trial was on respondent-father's own actions, not on whether he had failed to protect the child from another parent or nonparent adult, there was, nevertheless, clear and convincing evidence to support termination under MCL 712A.19b(3)(j) considering the two previous incidents of drug exposure and the risk that respondent-father's conduct presented to the child.

Affirmed.

/s/ Sima G. Patel
/s/ Christopher M. Murray
/s/ Christopher P. Yates